UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| SCARLETT SOBOLAK AND BLANCA CHARPENTIER MCGEE | CIVIL ACTION NO. 15-1711 |
| VERSUS | JUDGE ELIZABETH FOOTE |
| CW&W CONTRACTORS, INC. | MAGISTRATE JUDGE HAYES |

## MEMORANDUM RULING

Before the Court is a Motion for Summary Judgment filed by the Defendant, CW&W Contractors, Inc. ("CW&W"). [Record Document 20]. Plaintiff, Blanca Charpentier McGee ("McGee") opposes the motion. [Record Document 28]. For the reasons assigned herein, Defendant's motion is hereby **GRANTED**.

## BACKGROUND FACTS

McGee began her employment with CW&W on April 11, 2012, in the position of travel coordinator. [Record Document 3 ¶ 7]. McGee arranged the travel and hotel accommodations for CW&W employees working out-of-town construction projects. [Record Document 20-2 ¶ 1; Warren Dep. at 14-24]. McGee was also responsible for creating a daily report that summarized information valuable to managing the day-to-day operations of the business. [Warren Dep. at 14-24].

While employed with CW&W, McGee alleges that she was sexually harassed at an off-campus cookout during the 2013 Labor Day holiday. [Record Document 3 ¶ 22]. CW&W General Manager, Ernie Simpson ("Simpson"), hosted

the cookout at his home in DeBerry, Texas. Id. Also in attendance were CW&W employees Angela Finley ("Finley") and James Traxler ("Traxler"). [McGee Dep. at 37-41]. McGee alleges that during the cookout she drank several shots of alcohol offered to her by Simpson because she did not believe she had the option to decline. [Record Document 3 ¶ 22]. She alleges that one of the drinks may have been drugged because shortly after taking a shot of alcohol she lost control of her body and could not move her arms or legs. Id. Thereafter, McGee alleges that Traxler picked up her legs and put them in his lap, while her upper body was resting against Simpson. Id. McGee alleges that Simpson then began speaking to her in a sexual manner and touched her breasts. Id. Shortly thereafter, McGee alleges that Simpson and Traxler decided to go back inside the house, and they had to assist her inside because she could not move. [McGee Dep. at 49]. McGee then went to her assigned bedroom and lay down on the bed. Id. Traxler slept beside her, but did not touch her. Id. at 49-51. The next morning McGee ate breakfast with Simpson before leaving his house because he allegedly required her to do so. Id. at 50. McGee also alleges that Simpson threatened her not to say anything at the office. [Record Document 3 ¶ 22].

When McGee arrived at the office the following Monday she was approached by co-plaintiff, Scarlett Sobolak ("Sobolak"), CW&W's Human Resources Manager, who inquired into her well being after noticing that she was upset. [McGee Dep. at 60]. McGee then informed Sobolak of what allegedly happened over the weekend. [Record Document 3 ¶ 22]. During her conversation with Sobolak, McGee asked Sobolak not to tell anyone about what

had transpired because she was afraid of negative consequences from Simpson. [McGee Dep. at 60-61]. However, McGee states that despite her request she felt that her conversation with Sobolak was her cry for help, and she thought Sobolak would fix the situation. Id. at 61. McGee did not tell her direct supervisor, Jennifer Corley Lewis ("Lewis"), because she feared repercussions from Simpson. Id. She did not tell Glen Warren ("Warren"), owner of CW&W, because she did not want to displease him and she was concerned that she would lose her job because she feared Warren would believe Simpson's version of the story. Id. at 61-63.

On December 10, 2013, several of CW&W's female employees spoke privately amongst themselves and determined that Simpson had allegedly behaved inappropriately with McGee, Sobolak, Lewis, and Finley. [Record Document 3 ¶ 24]. Thereafter, Lewis shared this information with Warren and a meeting was called to discuss the allegations. Id. at ¶ 25. In attendance were Warren, Lewis, Finley, McGee, Sobolak, and Brian Murry, CW&W's Contract Service Manager. Id. During the meeting, Warren asked each of the women to explain what had been going on. [McGee Dep. at 73]. Finley stated that she received text messages and phone calls from Simpson. [Lewis Dep. at 79; Record Document 28-5, Finley Aff. ¶ 6]. Lewis also received text messages from Simpson asking her to spend time with him outside of the office. [Lewis Dep. at 80]. Sobolak described her interactions with Simpson as an inappropriate

3

"emotional affair" and she indicated that she was leaving CW&W to work on her marriage and keep her family in tact. Id. at 81.[1]

McGee told Warren about Simpson allegedly touching her breasts at his house while she was intoxicated and unable to move or resist. [McGee Dep. at 73-74]. McGee also told Warren that Simpson threatened her not to tell anyone about the incident. Id. McGee described the meeting as extremely uncomfortable because she told her story in front of so many people and she felt ashamed. Id. at 74. McGee also said that while she was making her statement she could sense that Warren was angry with Simpson, so she kept her story short and to the point. Id. at 74-75.

On January 2, 2014, Simpson's employment with CW&W was terminated. [Record Document 3 ¶ 34]. McGee alleges that after Simpson's termination the office atmosphere became very tense and she began experiencing retaliation from other employees, such that the working conditions became so intolerable that she could no longer continue to work for CW&W. Id. at ¶ 35. Specifically, McGee made the following statements in her deposition regarding the retaliation:

> "I resigned my employment because after Mr. Ernie Simpson was terminated, the environment at work was awful. It was – everyone hated and blamed Scarlett [Sobolak] for what happened, which I understood a part of that." [McGee Dep. at 88-89].
>
> "Comments would fly on a daily basis about Scarlett, about what happened." Id. at 91.

---

[1] Sobolak alleges in this lawsuit that she was also a victim of sexual harassment by Simpson. [Record Document 3].

4

> "And the air in that office – well, you couldn't breathe. Because I felt animosity for having the audacity to still be Scarlett's friend. And the – it changed. From then on it changed." Id.
>
> "I felt animosity on several levels. One, I was still Scarlett's friend, even though I tried not to even discuss that I was still her friend, but I felt – I felt blamed that somehow they viewed that I carried some blame for what happened." Id. at 92.
>
> "I felt uncomfortable. I felt as an outsider. I did not – things changed. No one really wanted to have anything to do with me. I felt ostracized. And I tried. But no one can work in that type of environment." Id.
>
> "It wasn't that they didn't like me, it was that I obviously had done something to offend or hurt that company." Id. at 93.

McGee notes that her supervisor, Lewis, was aware that the atmosphere in the office had changed, stating in her deposition:

> "[...] she had a meeting with me and asked me how I was doing. And she specifically asked me, 'Do you feel that you can continue to work here? Do you feel that it has affected you?'" Id. at 91.

McGee responded: "Yes, it has affected me." Id. at 92. When asked whether she thought Lewis wanted her to resign, McGee stated: "Yes, I do." Id. at 93. McGee was asked why she felt Lewis wanted her to resign. McGee responded as follows:

> "Because I think that I was a daily reminder to her of what had happened. Because all of us that were involved were victims. Every single one of us. And I think it was a daily reminder of the awful things that had happened." Id.

Lewis stated in her deposition that she never witnessed any retaliatory conduct against McGee, and McGee never reported that she felt she was being subjected to retaliation. [Lewis Dep. at 108, 139]. However, Finley states in her affidavit that she witnessed retaliation against McGee as follows:

5

> I witnessed retaliation experienced by Ms. Blanca McGee in regards to certain members of the staff not speaking to her as often as they had in the past – this included myself. Jennifer Lewis would tell us "I am not sure how close she still is to Scarlett [Sobolak], so be careful what you say in front of her or to her."

[Record Document 28-5, Finley Aff. ¶ 7].

McGee submitted her resignation approximately two months after the December 10, 2013 meeting with Warren. When she submitted her resignation Lewis asked McGee whether her resignation had anything to do with the Sobolak/Simpson situation. [McGee Dep. at 96.]. McGee denied that it did, stating that she was resigning from her position because she was getting married and would be moving out of the area. [McGee Dep. at 96, Record Document 20-7, Ex. E]. McGee's last day of employment with CW&W was February 27, 2014. [Record Document 3 ¶ 37].

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) directs that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." [2] Summary judgment is appropriate when the pleadings, answers to interrogatories, admissions, depositions, and affidavits on file indicate that there is no genuine issue of material fact and that the moving party is entitled to

---

[2] Rule 56 was amended effective December 1, 2010. Per the comments, the 2010 amendment was intended "to improve the procedures for presenting and deciding summary judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged." Therefore, the case law applicable to Rule 56 prior to its amendment remains authoritative, and this Court will rely on it accordingly.

6

judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986). When the burden at trial will rest on the non-moving party, the moving party need not produce evidence to negate the elements of the non-moving party's case; rather, it need only point out the absence of supporting evidence. See Celotex, 477 U.S. at 322-323.

If the movant satisfies its initial burden of showing that there is no genuine dispute of material fact with the motion for summary judgment, the nonmovant must demonstrate that there is, in fact, a genuine issue for dispute at trial by going "beyond the pleadings" and designating specific facts for support. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,'" by conclusory or unsubstantiated allegations, or by a mere scintilla of evidence. Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1985) (internal citations omitted); Reid v. State Farm Mut. Auto Ins. Co., 784 F.2d 577, 578 (5th Cir. 1986) (the court must "review the facts drawing all inferences most favorable to the party opposing the motion"). While not weighing the evidence or evaluating the credibility of witnesses, courts should grant summary judgment where the critical evidence in support of the nonmovant is so weak and tenuous that it could not support a judgment in the nonmovant's favor. Little, 37 F.3d at 1075.

Additionally, Local Rule 56.1 requires the moving party to file a statement of material facts as to which it contends there is no genuine issue to be tried. Pursuant to Local Rule 56.2, the party opposing the motion for summary judgment must set forth a "short and concise statement of the material facts as to which there exists a genuine issue to be tried." All material facts set forth in the statement required to be served by the moving party "will be deemed admitted, for purposes of the motion, unless controverted as required by this rule." Local Rule 56.2.

## LAW AND ANALYSIS

### I. Time-Barred Claims

McGee's Amended and Restated Complaint includes claims against CW&W for hostile work environment/sexual harassment and retaliation under Title VII, 42 U.S.C. §§ 2000e2 and 2000e3, as well as claims under Louisiana's employment discrimination laws, La. RS. 23:301 and La. R.S. 51:2256. [Record Document 3]. McGee has conceded that her hostile work environment/sexual harassment claim under Title VII and all of her claims under Louisiana's employment discrimination laws are time-barred. Because McGee concedes these claims, they are dismissed.[3] [Record Document 28-1, fn 1]. McGee's only remaining claim is for Title VII retaliation.

---

[3] Time-barred incidents of discrimination may still be relevant background information for the court to consider in conjunction with the alleged discriminatory acts at issue in this case. See Ramsey v. Henderson, 286 F.3d 264, 268 (5th Cir. 2002).

## II. Title VII Retaliation[4]

McGee alleges that after she informed CW&W of sexual harassment by Simpson she experienced retaliation to such a degree that she was constructively discharged. Title VII makes it unlawful for an employer to discriminate against any employee because she has opposed an unlawful employment practice. 42 U.S.C. § 2000e-3(a). To establish a prima facie case of retaliation a plaintiff must show that (1) she engaged in protected activity, (2) the employer took an adverse action against her, and (3) a causal link existed between the protected activity and the adverse action. Baker v. American Airlines, Inc., 430 F.3d 750, 754 (5th Cir. 2005).

Protected activity is defined as "opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII." Ackel v. National Communications, Inc., 339 F.3d 376, 385 (5th Cir. 2003). McGee easily establishes the first element of her prima facie case for retaliation. During the December 2013 round-table meeting with Warren, the owner of CW&W, she described being touched in a sexual manner by Simpson without her consent. McGee also informed Sobolak, CW&W's Human Resources Manager, of Simpson's alleged sexual harassment when she returned to work following the Labor Day cookout. The fact that McGee asked Sobolak not to say anything about the incident is immaterial. McGee informed CW&W's Human Resources Manager

---

[4] Louisiana law on discrimination mirrors Title VII. Louisiana courts rely on federal jurisprudence for guidance. See Burnett v. East Baton Rouge School District, 2011-1851, 99 So. 3d 54 (La. App. 1 Cir. 5/3/12).

9

that the General Manager of the company touched her inappropriately. Sobolak should have immediately taken action to handle McGee's serious complaint of sexual harassment. Clearly, McGee engaged in protected activity under Title VII.

McGee alleges that she was constructively discharged from her employment with CW&W, and that her constructive discharge is tantamount to an adverse employment action sufficient to prove her prima facie case of retaliation. To establish an adverse employment action premised on a constructive discharge, the plaintiff must demonstrate that her employer made conditions so difficult or unpleasant that a reasonable employee in her position would have felt compelled to resign. Harvill v. Westward Communications, LLC, 433 F.3d 428, 439-440 (5th Cir. 2005). "The evidence must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." Stover v. Hattiesburg Public School Dist., 549 F.3d 985, 991 (5th Cir. 2008) (quoting Landgraf v. USI Film Products, 968 F.2d 427 (5th Cir. 1992)). The Fifth Circuit has considered the following events as relevant in determining whether a reasonable employee would feel compelled to resign: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to cause the employee's resignation; or (6) offers of early retirement that would make the employee worse off whether the offer was accepted or not. Aryain v. Wal-Mart Stores Texas LP, 534 F.3d 473, 481 (5th Cir. 2008).

Taking all of McGee's allegations as true, she has not presented any evidence of an adverse employment action similar to those discussed in <u>Aryain</u>. McGee was not demoted. CW&W did not reduce her salary or her benefits. There is no evidence in the record that McGee's job responsibilities were changed. She was the travel coordinator and the author of the daily report when she disclosed her encounter with Simpson and she was still assigned those duties when she resigned. CW&W did not offer her an early retirement. The only evidence in the record is that McGee states that she felt ostracized and uncomfortable after the round-table meeting with Warren.

Plaintiff cites <u>Halliburton Inc. v. Admin. Review Board</u>, 771 F.3d 254 (5th Cir. 2014) as support for her theory that ostracism alone is sufficient to establish an adverse employment action. The Court finds <u>Halliburton</u> distinguishable from this case. The plaintiff in <u>Halliburton</u> filed a claim for retaliation under the Sarbanes-Oxley Act, 18 U.S.C. § 1514A(a), after he acted as a whistleblower and reported his colleagues to the Securities and Exchange Commission ("SEC"). <u>Halliburton</u>, 771 F.3d at 256. Plaintiff alleged that his colleagues engaged in fraudulent accounting practices, which resulted in an official SEC investigation of the entire accounting department. <u>Id.</u> at 256-257. When the plaintiff's supervisor purposefully disclosed his name as the SEC whistleblower in a group email to the very colleagues the plaintiff reported, it created an atmosphere of ostracism. <u>Id.</u> at 257. The ostracism was then used by the supervisor to scold the plaintiff for not being a "team player," thus making the ostracism not merely a social concern, but potentially a limit on the plaintiff's opportunity for future

11

advancement in the company.  Id. at 262.   In this context, the Halliburton court found that the disclosure of plaintiff's identity to his coworkers could be considered materially adverse, and may dissuade a reasonable worker from lodging a complaint.  Id.

The Fifth Circuit has not explicitly expanded the Halliburton analysis of ostracism to Title VII cases. The Fifth Circuit has consistently held in Title VII cases that "mere ostracism in the workplace is not grounds for a retaliation claim []." Manatt v. Bank of America, NA, 339 F.3d 792, 804 (5th Cir. 2003). Ostracism by co-workers is not materially adverse but instead falls into the category of "petty slights, minor annoyances, and simple lack of good manners" that the Supreme Court has found not to be actionable retaliatory conduct. Stewart v. Mississippi Transp. Com'n, 586 F.3d 321, 332 (5th Cir. 2009) (citing Burlington Northern and Santa Fe v. White, 548 U.S. 53, 68, 126 S.Ct. 2405, 2415). Title VII "does not set forth a general civility code for the American workplace." Stewart, 586 F.3d at 332 (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80, 118 S.Ct. 998, 1002 (1998)).

Even under the standard set forth in Halliburton, the ostracism McGee alleges is insufficient to establish an adverse employment action.  McGee states that the atmosphere at the office was awful, that she felt animosity for remaining friends with Sobolak, and that she felt ostracized and like "no one really wanted to have anything to do with me." [McGee Dep. at 88-91].  Finley provided an affidavit that indicates members of CW&W staff did not speak to McGee as often as they had in the past. [Finley Aff. ¶ 7].  McGee's allegations of ostracism are

consistent with the "petty slights, annoyances, and simple lack of good manners" noted in Stewart.  There is no indication that the alleged ostracism prevented McGee from performing the essential duties of her job. There is no evidence that CW&W employees did not allow McGee to make their hotel reservations, or that she was prevented from drafting the company's daily report. Finally, there is no evidence in the record to suggest that CW&W negatively reviewed McGee's job performance due to the alleged ostracism.  Rather, the evidence suggests that McGee's coworkers simply decided not to engage in casual conversation with her.

Plaintiff also argues that in addition to the examples of adverse employment actions set forth in Aryain, an employee may prove constructive discharge if she resigns after the employer communicates to her that she will be fired.  See EEOC v. University of Chicago Hospitals, 276 F.3d 326 (7th Cir. 2002) (employee told by supervisor that an error was "the last straw"); Spulak v. K Mart Corp., 894 F.2d 1150 (10th Cir. 1990) (employee given ultimatum to retire or be fired); Carter v. Town of Benton, 2010 WL 2301294 (W.D. La. June 7, 2010) (employee given option to resign or be terminated).  The only evidence in the record offered by McGee to support this argument is when Lewis asked McGee, "Do you feel you can continue to work here. Do you feel it has affected you?" [McGee Dep. at 91-92]. Merely questioning an employee as to whether she would like to continue working at a company is markedly different than giving an employee an ultimatum to resign/retire or face termination.  McGee's allegation is insufficient.

13

The Court finds that McGee has failed to allege sufficient facts to establish that her resignation was in fact a constructive discharge. The facts alleged do not rise to such a level that a reasonable employee in her position would have been compelled to resign. Because the Court finds that the allegations do not support a claim for constructive discharge, and McGee has offered no other evidence of an adverse employment action as defined by Title VII, McGee cannot prove her prima facie case of retaliation. Accordingly, McGee's remaining claim for Title VII retaliation must be dismissed.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [Record Document 20] is hereby **GRANTED**. Plaintiff Blanca McGee's claims against CW&W are hereby **DISMISSED WITH PREJUDICE**.

**THUS DONE AND SIGNED** in Shreveport, Louisiana this 22nd day of January, 2018.

_____
ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE