UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

SCARLETT SOBOLAK AND                        CIVIL ACTION NO. 15-1711
BLANCA CHARPENTIER MCGEE

VERSUS                                      JUDGE ELIZABETH FOOTE

CW&W CONTRACTORS, INC.                      MAGISTRATE JUDGE HAYES

## MEMORANDUM RULING

Before the court is a Motion for Summary Judgment filed by the
Defendant, CW&W Contractors, Inc. ("CW&W"). [Record Document 22]. Plaintiff,
Scarlett Sobolak ("Sobolak"), opposes the motion. [Record Document 29].  For
the reasons assigned herein, Defendant's motions is hereby **GRANTED IN
PART** and **DENIED IN PART**.

## BACKGROUND FACTS

Sobolak's Amended and Restated Complaint contains claims against
CW&W for hostile work environment/sexual harassment and retaliation under
Title VII, 42 U.S.C. §§ 2000e2 and 2000e3, and under Louisiana's comparative
state laws, La. R.S. 23:301 et seq and La. R.S. 51:2256. [Record Document 3].
Sobolak alleges that she was subjected to sexual harassment by CW&W owner,
Glen Warren ("Warren"), General Manager, Ernest Simpson ("Simpson"), and a
coworker, Tony Stewart ("Stewart"). Sobolak also claims that she experienced
retaliation after she complained to Warren.

Sobolak was hired by CW&W on July 25, 2011, to serve as its Human
Resources Manager. [Record Document 3 ¶ 9; Sobolak Dep. at 40]. Prior to

Sobolak's arrival CW&W did not have an employee dedicated to human resources. [Warren Dep. at 22-24]. Sobolak had previously worked as an assistant to a Human Resources Director, but she had no prior experience as a department head of a human resources department. Id. However, Warren was willing to take a chance on Sobolak because she was a "smart, young lady" and he was willing to send her to training to acquire additional knowledge. [Warren Dep. at 21, 31]. The record demonstrates that Sobolak never received additional training. [Warren Dep. at 32; Lewis Dep. at 45, 47]. Even so, Sobolak's superiors were pleased with her work. [Warren Dep. at 47-48]. As part of her duties, Sobolak created an employee handbook for CW&W, which included a sexual harassment policy. [Record Document 22-1, Ex. C].

In February 2013, CW&W hired Simpson as General Manager. [Record Document 3 ¶ 13; Warren Dep. at 58]. Simpson reported directly to Warren, and all other employees reported directly to Simpson or their immediate supervisors. [Lewis Dep. at 59]. Sobolak alleges that shortly after Simpson was hired he began sexually harassing her. In mid-April 2013, Sobolak alleges that she was in Simpson's office discussing work-related matters when he began asking her questions of a private and sexual nature. [Record Document 3 ¶ 14]. Sobolak states that the questions made her extremely uncomfortable, but she answered them because Simpson was her manager and she did not think she could ask him to stop without offending him. Id. Sobolak claims that during the meeting Simpson made a comment about oral sex, closed and locked his office door, and

walked over to where she was seated. Id. Sobolak alleges that Simpson then exposed himself to her. Id. She alleges that she felt embarrassed, intimidated, and pressured to perform oral sex. Id. She complied because she felt had no other option. [Sobolak Dep. at 94]. Sobolak states that afterwards she was in a state of shock and felt shame and embarrassment. [Record Document 3 ¶ 15]. She was also concerned that her marriage had been placed in jeopardy, and that she might lose her job because what occurred was inappropriate. [Sobolak Dep. at 92-93].

Thereafter, Sobolak alleges that nearly every interaction she had with Simpson was of a sexual nature. [Record Document 3 ¶ 16]. She alleges that she received pictures of Simpson's private parts on an almost daily basis, and that he requested pictures of her naked body, sometimes performing sexual acts, which she provided. Id. at 19. On May 7, 2013, Sobolak drove to Simpson's house to engage in sexual intercourse because he asked her to do so and she felt she could not decline. [Sobolak Dep. at 95-96; Record Document 3 ¶ 17]. Between April 2013 and December 2013, Plaintiff engaged in approximately 25 separate sexual encounters with Simpson. [Record Document 3 ¶ 18]. These encounters occurred in Simpson's office at CW&W, at his home in DeBerry Texas, in Sobolak's vehicle, and in hotel rooms in Bossier City, Louisiana. [Sobolak Dep. at 39, 40, 80, 81, 102-103, 115-116]. Sobolak contends that she felt obliged to engage in sexual acts because she felt hopeless and unable to deny Simpson's advances because he had substantial power and control over

her. [Record Document 3 ¶¶ 16-17]. Sobolak claims that she was in a constant state of pressure, fear, hopelessness, and disbelief about the situation. [Record Document 3 ¶ 18]. She alleges that she tried to end all contact with him, but each time she was reminded by Simpson that she should comply with his requests in order to keep her job. Id.

Simpson viewed his interactions with Sobolak in a completely different light. Specifically, Simpson states that during the meeting when their first sexual interaction occurred, it was Sobolak who initiated the encounter. [Simpson Dep. at 28]. He states that Sobolak made a comment to him about her breasts, closed his office door, and then propositioned him. Id. at 29. Simpson also states that it was Sobolak who suggested that they meet at his home the first time they engaged in sexual intercourse. Id. at 33-34. He also maintains that he had a consensual and loving relationship with Sobolak. Simpson testified that he was in love with Sobolak and he thought that she reciprocated those feelings. Id. at 54. Sobolak frequently told Simpson that she loved him, wanted to marry him, and have him be the stepfather to her children. [Sobolak Dep. at 74-75]. Sobolak maintains that every time she received a text message or profession of love from Simpson she would respond in kind because she felt an expectation for her emotions to match his. Id. at 74.

Sobolak claims that the situation with Simpson became so overwhelming that she gave her verbal notice of resignation to her immediate supervisor, Jennifer Corley Lewis ("Lewis"), on November 25, 2013. [Record Document 20 at

¶ 20].  During her meeting with Lewis, Sobolak denied that she was having a

sexual relationship with Simpson, instead describing their relationship as an

"emotional affair." [Sobolak Dep. at 77-78].  Sobolak told Lewis that she needed

to remove herself from the situation and create distance between herself,

CW&W, and Simpson. [Lewis Dep. at 72]. Sobolak did not reveal the physical

nature of her interactions with Simpson because she was trying to save her

marriage and "no one could know" about Simpson. [Sobolak Dep. at 78]. Lewis

testified that Sobolak gave one or two weeks notice, but her final day was in flux

because Sobolak wanted to finish a work project. [Lewis Dep. at 72]. Sobolak

claims that Simpson demanded that she remain with CW&W until her

replacement was found. [Record Document 3 ¶ 20].  Lewis confirmed that

Simpson tried to get Sobolak to remain with the company through Christmas,

stating "he [Simpson] was very eager to have her stay, and she [Sobolak] was

ready to go." [Lewis Dep. at 75]. Lewis asked Warren whether he had any

interest in keeping Sobolak beyond her initially agreed upon departure date of

December 13, 2013.  Id. Warren was not interested in prolonging Sobolak's

employment if she wanted to leave. Id.

On December 7, 2013, Sobolak's husband saw an email on her phone

from Simpson wherein he expressed his love for Sobolak and stated that he

looked forward to the day they could be together. [Record Document 22-2 ¶ 28].

Sobolak desperately tried to get her phone away from her husband and a

physical altercation ensued between them. [Id. at ¶ 29].  Thereafter, Sobolak

deleted all of the text messages between herself and Simpson by performing a factory re-set of her cell phone. [Sobolak Dep. at 76]. She did so to prevent her husband from reading the messages in an effort to save her relationship with her husband. Id. Sobolak continued to deny the extent of her interactions with Simpson to her husband. [Record Document 22-2 ¶ 30]. On December 8, 2013, Sobolak's husband contacted Warren by telephone to make him aware of Simpson's inappropriate behavior and to inform Warren that he believed his wife and Simpson were having an affair. [Record Document 3 ¶ 23; Record Document 22-2 ¶ 31].

On December 10, 2013, several of CW&W's female employees spoke privately amongst themselves and determined that Simpson had allegedly behaved inappropriately with Sobolak and her co-plaintiff Blanca McGee ("McGee"), Lewis, and Angela Finley ("Finley"). [Record Document 3, ¶ 24]. Lewis shared this information with Warren and a meeting was called to discuss the allegations. Id. at ¶ 25. In attendance were Warren, Lewis, Finley, McGee, Sobolak, and Brian Murry, CW&W's Contract Service Manager.[1] Id. During the meeting Warren asked each of the women to explain what had been going on. [Lewis Dep. at 79]. Finley received inappropriate text messages and phone calls from Simpson. [Lewis Dep. at 79; Record Document 28-5, Finley Aff. ¶ 6]. Lewis received text messages from Simpson asking her to spend time with him outside

---

[1] Brian Murry attended the meeting because Warren wanted another CW&W manager in attendance. [Warren Dep. at 70].

of the office. [Lewis Dep. at 80]. McGee described a nonconsensual sexual encounter with Simpson that occurred during a Labor Day cookout at Simpson's house. Id. at 79-80. Sobolak described her interactions with Simpson as an inappropriate "emotional affair." [Warren Dep. at 78].[2] According to Lewis, Sobolak stated that Simpson had been a good friend to her, but she now felt manipulated by him after learning that he was making advances towards other women. [Lewis Dep. at 85].

Warren responded to the allegations by telling the women that he wished they had come to him earlier, but that he would handle the situation. [Warren Dep. at 80]. Sobolak claims that Warren also stated that the timing was not good for the company because Simpson was needed to complete an important job and CW&W's financial well being was paramount. [Record Document ¶ 25]. Sobolak also alleges that Warren asked the female employees to remain silent about the allegations. Id. Lewis confirmed that Warren asked the women to please keep the meeting confidential. [Lewis Dep. at 87]. He also stated that he needed time to think about the problem and determine the appropriate course of action. Id.

---

[2] Sobolak claims that at the time of the meeting Warren was already aware that she and Simpson were inappropriately spending time together because a few months prior to the meeting Warren made an unannounced stop at Simpson's house and saw her car in Simpson's driveway. [Sobolak Dep. at 157]. Warren testified that around October 2013 he did see Sobolak's car in Simpson's driveway and at that point he knew something was going on between them. [Warren Dep. at 63]. However, Warren testified that when he confronted Simpson about seeing Sobolak at his home, Simpson maintained that they were just friends and he was consoling her through a rough patch. [Warren Dep. at 66]. Warren told Simpson "If you don't stop it, I'm going to stop it." [Warren Dep. at 66]. He testified that he did not know Simpson had ignored his directive until the December 10, 2013 meeting. [Warren Dep. at 68].

After the meeting the female employees still reported to Simpson, but he was out of town working a large job in Jackson, Mississippi, and was rarely in the office. Id. Sobolak also alleges that Warren's wife came into the office to speak with Lewis to see if there was any way to correct the situation and allow Simpson to remain with the company because he had been hired to allow Warren to have more free time to spend with their family. [Record Document 3 at ¶ 28]. Warren did not know that his wife talked to Lewis until he read about the meeting in Sobolak's complaint. [Warren Dep. at 136].

Sobolak's last day at CW&W was December 13, 2013, just a couple of days after the meeting with Warren. [Record Document 3 ¶ 29, Doc 22-2 ¶ 36]. That same day Sobolak and her husband began marital counseling. [Sobolak Dep. at 130]. During the counseling session, Sobolak continued to deny that she had sex with Simpson, instead describing the relationship as an emotional affair. Id. at 131. Eventually, on December 21, 2013, Sobolak told her husband that she had engaged in sexual relations with Simpson. Id. at 141. Sobolak alleges that on December 31, 2013, she began to receive threatening messages from Simpson on her phone and social media account. [Record Document 3 at ¶ 30]. On January 2, 2014, she filed a formal complaint against Simpson with the Bossier City Police Department. Id. at 31.

In the interim, about a week and half after the December 10, 2013 round table meeting with the female employees, Warren met with Simpson to discuss the allegations. [Warren Dep. at 89-90]. Simpson denied that he did anything

inappropriate, but he admitted that he was in love with Sobolak. Id. at 91-92.

Warren testified that he told Simpson his behavior was unacceptable and that he initially terminated Simpson's employment at that meeting. However, Warren's financial advisor, John Griffin, who was present at the meeting, interceded and urged Warren to contact legal counsel first because Simpson had an employment contract with CW&W. [Warren Dep. at 91-92; Record Document 22-10, Griffin Aff. ¶ 6]. Warren suspended Simpson from his duties until he could consult with legal counsel. [Warren Dep.at 92; Griffin Aff. ¶ 7]. Warren stated that he told Simpson not to contact any of the employees at CW&W, but that he later learned from Lewis that Simpson continued to try to contact Sobolak. [Warren Dep. at 96]. Sobolak was no longer an employee of CW&W at this point. After consultation with legal counsel, CW&W terminated Simpson's employment on January 2, 2014, with a severance package. [Record Document 22-2 ¶ 40; Warren Dep. at 98, 100].

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) directs that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." [3]

---

[3] Rule 56 was amended effective December 1, 2010. Per the comments, the 2010 amendment was intended "to improve the procedures for presenting and deciding summary judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged." Therefore, the case law applicable to Rule 56 prior to its amendment remains authoritative, and this Court will rely on it accordingly.

Summary judgment is appropriate when the pleadings, answers to interrogatories, admissions, depositions, and affidavits on file indicate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986). When the burden at trial will rest on the non-moving party, the moving party need not produce evidence to negate the elements of the non-moving party's case; rather, it need only point out the absence of supporting evidence.  See Celotex, 477 U.S. at 322-323.

If the movant satisfies its initial burden of showing that there is no genuine dispute of material fact with the motion for summary judgment, the nonmovant must demonstrate that there is, in fact, a genuine issue for dispute at trial by going "beyond the pleadings" and designating specific facts for support.  Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).  "This burden is not satisfied with 'some metaphysical doubt as to the material facts,'" by conclusory or unsubstantiated allegations, or by a mere scintilla of evidence. Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).  However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1985) (internal citations omitted); Reid v. State Farm Mut. Auto Ins. Co., 784 F.2d 577, 578 (5th Cir. 1986) (the court must "review the facts drawing all inferences most favorable to the party opposing the motion").  While not weighing the evidence or evaluating the credibility of

witnesses, courts should grant summary judgment where the critical evidence in support of the nonmovant is so weak and tenuous that it could not support a judgment in the nonmovant's favor.  Little, 37 F.3d at 1075.

Additionally, Local Rule 56.1 requires the moving party to file a statement of material facts as to which it contends there is no genuine issue to be tried. Pursuant to Local Rule 56.2, the party opposing the motion for summary judgment must set forth a "short and concise statement of the material facts as to which there exists a genuine issue to be tried."  All material facts set forth in the statement required to be served by the moving party "will be deemed admitted, for purposes of the motion, unless controverted as required by this rule."  Local Rule 56.2.

## LAW AND ANALYSIS

### I.    Time-Barred claims

Sobolak's Amended and Restated Complaint contains claims against CW&W for hostile work environment/sexual harassment and retaliation under Title VII, 42 U.S.C §§ 2000e2 and 2000e3, and Louisiana's employment discrimination laws, La. R.S. 23:301 et seq and La. R.S. 51:2256.  [Record Document 3].  Sobolak has conceded that she does not have a claim for retaliation. [Record Document 29-1, fn 2].  Sobolak also concedes that her claims

for sexual harassment based on the conduct of Warren and Stewart are time-barred. Id. [4]

Because Plaintiff concedes that her claim for retaliation as well as her claims for hostile work environment/sexual harassment concerning the alleged actions of Warren and Stewart are time-barred, they are hereby **DISMISSED**.

## II. Title VII Sexual Harassment [5]

Title VII of the Civil Rights Act makes it unlawful for an employer to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment, because of such individual's race, color, sex, religion, or national origin. 42 U.S.C. § 2000e-2(a)(1). Sexual harassment is a form of gender discrimination. Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 2404 (1986).

### a. Prima Facie Case of Sexual Harassment

Under Title VII, an employer's liability for sexual harassment in the workplace is dependent on the status of the alleged harasser. In cases where the harasser is a co-worker a plaintiff must establish the following five elements of her prima facie case: (1) she belongs to a protected group; (2) she was

---

[4] Time-barred incidents of discrimination may still be relevant background information for the court to consider in conjunction with the alleged discriminatory acts at issue in this case. See Ramsey v. Henderson, 286 F.3d 264, 268 (5th Cir. 2002).

[5] Louisiana law prohibiting sexual discrimination and harassment mirrors the federal statute, 42 U.S.C. §§ 2000e et seq. Accordingly, Louisiana courts look to the federal statute to determine the validity of a sexual harassment claim pursuant to La. R.S. 23:332. Whittington v. Kelly, 40,386, 917 So.2d 688 (La. App. 2 Cir. 12/14/05).

subjected to unwelcome harassment; (3) the harassment was based on her membership in a protected group; (4) the harassment was sufficiently severe or pervasive to affect a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. When the harasser is a supervisor, the plaintiff need only prove the first four elements. Faragher v. City of Boca Raton, 524 U.S. 775, 803, 118 S.Ct. 2275, 2291 (1998). It is undisputed that Simpson was Sobolak's supervisor. He was the General Manager of CW&W, reporting only to Warren, the owner of the company. [Lewis Dep. 59]. Sobolak reported directly to Lewis, who reported to Simpson. Id. Therefore, only the first four elements are required.

It is uncontested that Sobolak is a member of protected class (female), and the alleged harassment occurred because she is female. To establish a prima facie case the alleged harassment must be sufficiently severe or pervasive to alter the terms and conditions of employment, creating a hostile work environment. Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370 (1993). The alleged harassment must be "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher, 524 U.S. at 787. The deliberate and unwanted touching of a plaintiff's intimate body parts is often found to constitute severe sexual harassment. Harvill v. Westward Communications, LLC, 433 F.3d 428, 436 (5th Cir. 2005). Sobolak alleges that

Simpson began sexually harassing her during a meeting in his office at CW&W by questioning her in detail about her sex life, closing and locking his office door, and exposing his genitals to her. [Sobolak Dep. at 88-89]. She also alleges that Simpson texted her pictures of his genitals and asked her to engage in sexual acts on a routine basis.  If the Court assumes that Sobolak's statements are truthful, Simpson's unrelenting pursuit of a sexual relationship would be sufficiently severe and pervasive to alter the terms and conditions of Sobolak's employment, and would be both subjectively and objectively hostile to a reasonable person.

The only element in true controversy is whether Simpson's actions toward Sobolak were indeed unwelcome.  If they were unwelcome, Sobolak will have met her prima facie case of sexual harassment. Conversely, if they were welcome and consensual Simpson's actions would not be harassment.  A plaintiff may participate in a sexual act voluntarily in the sense that she was not forced against her will, yet the sexual advances may still be unwelcome. Meritor, 477 U.S. at 68.  The correct inquiry is whether a plaintiff indicated through her conduct that the sexual advances were unwelcome, not whether she participated voluntarily. Id.  "The gravamen of any sexual harassment claim is that the alleged sexual advances were unwelcome."  Id.  "The question of whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." Meritor, 477 U.S. at 68. "The EEOC Guidelines emphasize that the trier of fact

must determine the existence of sexual harassment in light of 'the record as a whole' and the 'totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred.'" Id. at 69 (quoting 29 C.F.R. § 1604.11(b)).

Plaintiff maintains that all of her sexual encounters with Simpson were unwelcome, and she participated and reciprocated his affections because she felt that she had to comply because he was her boss. When questioned as to whether she engaged in sex with Simpson consensually, Sobolak responded: "I would say that I was coerced. [] I did not have sex with him in a free and willing way." [Sobolak Dep. at 72]. However, Plaintiff admits that she never explicitly told Simpson that she did not want to have sex with him because she did not feel she was in the position to do so. Id.

CW&W on the other hand argues that Sobolak willingly participated in a sexual relationship with Simpson as evidenced by the frequency of their meetings, the explicit videos and photos she sent to Simpson, and her professions of love for Simpson. CW&W also argues that Sobolak did not end her relationship with Simpson until she learned that he had made advances toward other women working in the office. Finally, CW&W argues that Sobolak never indicated through her conduct that Simpson's advances were unwelcome.

The issue of whether Simpson's advances and physical interactions with Sobolak were welcome or unwelcome presents a difficult issue for the Court. The question inherently turns on the credibility of the testimony of Sobolak and

Simpson. She indicates that his affections were unwelcome. If true, the numerous instances of Simpson physically touching Sobolak and engaging in sexual acts with her would certainly constitute severe sexual harassment.  On the other hand, if Simpson's actions were welcome then Sobolak cannot demonstrate a prima facie case for sexual harassment.  This Court must consider the evidence in the light most favorable to the nonmoving party, and it cannot weigh the evidence or assess credibility on summary judgment. Based on the totality of the circumstances presented in this case, the Court finds that genuine issues of material fact remain regarding Sobolak's sexual harassment claim.

      **b.**     **Tangible Employment Action / Constructive Discharge**

Sobolak asserts that she experienced a tangible employment action in the form of a constructive discharge. [Record Document 29-1 at 17]. A constructive discharge may be considered a tangible employment action that precludes an employer from asserting the Ellerth/Faragher affirmative defense to vicarious liability for its employee's harassment. Aryain v. Wal-Mart Stores Texas LP, 534 F.3d 473, 480 (5th Cir. 2008)(citing Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257; Faragher, 524 U.S. 775). "[A]n employer is strictly liable for supervisor harassment that culminates in a constructive discharge." Aryain, 534 F.3d at 480 (citing Ellerth, 524 U.S. at 765).  "A constructive discharge occurs when the employer makes working conditions so intolerable that a reasonable person in the employee's position would feel compelled to resign." McCoy v. City of Shreveport, 492 F.3d 551, 557 (5th Cir. 2001).  The

severity or pervasiveness of the harassment must be greater than what is required to prove hostile work environment. Harvill, 433 F.3d at 440. The Fifth Circuit considers a variety relevant factors, including the following: (1) demotion; (2) reduction in compensation; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; (6) reassignment to work under a younger or less experienced superior; or (7) offers of early retirement that would make the employee worse off whether accepted or not. Brown v. Kinney Shoe Corp., 237 F.3d 556, 566 (5th Cir. 2001).

Plaintiff argues that the record supports her claim of constructive discharge because she was subjected to sexual harassment so severe that a reasonable person in her position would be forced to resign. Plaintiff notes that Lewis' testimony demonstrates that she resigned her position with CW&W because of Simpson. Lewis testified as follows:

> She said that she needed to resign because she wanted to remove herself from the situation. That she wanted to save and repair her marriage. That her family and her children and her husband was [sic] her primary concern. And she wanted to put any fears that Andy [Sobolak's husband] may have had to rest, and she felt like she needed to distance herself from CW&W and Ernie Simpson.

[Lewis Dep. at 72]. When questioned again about Sobolak's reasons for resigning, Lewis stated: "primarily to work on her marriage but she also stated that the reason her marriage was in trouble is because of Ernie Simpson." Id. at 86. Sobolak maintains that she submitted her resignation because the situation with Simpson had become intolerable and she had no choice but to leave.

CW&W argues that Sobolak cannot meet the standard for constructive discharge. Sobolak was not demoted. She did not receive a reduction in salary or benefits. She was not given menial or degrading work, nor was she reassigned. In fact, CW&W suggests that the evidence in the record demonstrates that Simpson was actively trying to get Sobolak promoted. Lewis testified that Simpson told her that he was working to make Human Resources a stand-alone department. Id. at 68. If successful, Simpson would have become Sobolak's immediate supervisor. Arguably, this would have given Simpson even more control over Sobolak.

Establishing a constructive discharge based solely on the severity of alleged sexual harassment is a very high burden for any plaintiff to meet. However, based on the facts of this case and the severity of the alleged sexual harassment, the Court finds that questions of fact remain as to whether Plaintiff was constructively discharged.

      **c.**        **Ellerth/Faragher Affirmative Defense**

CW&W has asserted the Ellerth/Faragher affirmative defense to vicarious liability for Simpson's actions.  If it is ultimately determined that Sobolak was not constructively discharged, CW&W argues that it would still be entitled to summary judgment. [Record Document 22-1 at 15].  An employer may escape liability for sexual harassment/hostile work environment if it can establish the Ellerth/Faragher affirmative defense; that (1) the employer exercised reasonable care to prevent and correct the harassing behavior, and (2) the plaintiff

unreasonably failed to take advantage of the preventive or corrective opportunities provided by the employer. Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 807. To properly assert the affirmative defense, the defendant must prove both elements. Casiano v. AT&T Corp., 213 F.3d 278, 284 (5th Cir. 2000).

CW&W maintains that it cannot be vicariously liable for Simpson's alleged actions because CW&W exercised reasonable care to prevent and correct any harassing behavior, and Sobolak failed to take advantage of CW&W's reporting system. CW&W produced an excerpt from their employee manual dated December 22, 2011. The courts will look to an employer's policies and programs to determine whether it took reasonable measures to prevent the alleged behavior. See EEOC v. Boh Brothers Construction Co., LLC, 731 F.3d 444, 463 (5th Cir. 2013). However, not all policies are sufficient; "generic policies that offer no specific complaint procedure may be insufficient to satisfy the Ellerth/Faragher defense." Id. CW&W's policy excerpt is titled "Harassment and Discrimination Policy" and defines sexual harassment as:

> Unwelcome or unwanted sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature when (1) submission to or rejection of this conduct by an individual is used explicitly or implicitly as a factor in decisions affecting hiring, evaluation, promotion, or other aspects of employment; or (2) this conduct substantially interferes with an individual's employment or creates an intimidating, hostile, or offensive work environment.

> Examples of sexual harassment include, but are not limited to, unwanted sexual advances; demands for sexual favors in exchange for favorable treatment or continued employment; repeated sexual jokes, flirtations, advances, or propositions; verbal abuse of a sexual nature; graphic commentary about an individual's body,

sexual prowess, or sexual deficiencies; leering; whistling; touching; pinching; assault; coerced sexual acts; suggestive insulting; obscene comments, gesture[s], and emails; and display in the work place of sexually suggestive objects or pictures.

[Record Document 22-5, Ex. C]. CW&W's policy also contains information regarding its reporting procedure:

If you believe that you have been the victim of sexual or other harassment or discrimination in the work place, you should take the following steps: (1) Report and discuss the matter with your supervisor and/or human resources representative. (2) If you believe your supervisor or manager to be the source of the harassment, report this to the human resources representative.

CW&W will investigate and attempt to resolve your complaint, as well as take any warranted disciplinary action, as soon as possible. If for any reason you believe this has not occurred within a reasonable period of time, refer this problem to any other supervisor in the CW&W, or to the CW&W Contractors, Inc. President.

Id.

CW&W argues that it can meet the Ellerth/Faragher defense because it has an anti-harassment policy with a reporting procedure of which Sobolak was aware; yet she failed to report the harassment. The CW&W policy does define sexual harassment, and it does provide a reporting procedure. However, the mere existence of a policy by itself is not sufficient to establish as a matter of law that the company exercised reasonable care to prevent and correct harassing behavior. The Fifth Circuit has held that an employer's failure to properly promulgate or publicize its policy may preclude summary judgment. See Pullen v. Caddo Parish School Board, 830 F.3d 205 (5th Cir. 2016). However, the Fifth Circuit has also consistently found the first prong of the Ellerth/Faragher defense

to be met when a plaintiff admits that she knew about the policy, and when the court finds the policy to be reasonable. Id. at 210.

The facts of this case present an interesting twist. On its face, CW&W's policy appears to be sufficient. It defines sexual harassment and provides a reporting mechanism for employees. Sobolak, as Human Resources Manager for CW&W, was aware of both the policy and the reporting procedure because she created the employee handbook. [Sobolak Dep. at 40]. She did so by finding an example of an employee handbook on the internet, to which she made a few additions. Id. at 41. Based on this information, Sobolak was aware of both the policy and the reporting procedure.

However, there is also evidence in the record that creates doubt as to whether CW&W's efforts to prevent sexual harassment throughout its organization were reasonable or sufficient. Warren testified that he did not review the handbook Sobolak created and did not receive training on the handbook. [Warren Dep. at 33]. When a new employee was hired by CW&W, Sobolak would merely hand them a copy of the employee handbook and obtain an acknowledgment signature. [Sobolak Dep. at 42]. She did not review the handbook with the employees. Id. Sobolak did not offer training to new or current employees on the handbook or the sexual harassment policy. [Warren Dep. at 33].

CW&W employees also testified that they did not receive training regarding sexual harassment. Finley states in her affidavit that she never

received a copy of the CW&W employee handbook, nor was she provided any training regarding sexual harassment in the workplace. [Record Document 29-7, Finley Aff. ¶ 3]. Most importantly, Simpson, as General Manager of a company with 150 employees, testified that he was never provided training in sexual harassment. [Simpson Dep. at 120]. Based on this evidence, the Court finds that fact issues remain as to whether CW&W took reasonable steps to prevent and remedy sexual harassment within the organization.

The second prong of the Ellerth/Faragher defense requires the employer to prove that the plaintiff failed to take advantage of corrective procedures provided by the employer. Faragher, 524 U.S. at 807. The policy underpinning this requirement is to "encourage employees to report harassing conduct before it becomes severe and pervasive." Ellerth, 524 U.S. at 764. When an employee fails to report alleged harassment, it deprives the employer of the opportunity to correct the behavior.

CW&W maintains that Sobolak unreasonably failed to take advantage of the reporting procedure set forth in its employee handbook. The CW&W reporting procedure provided that an employee experiencing sexual harassment should report the behavior to her immediate supervisor or the HR representative. Lewis was Sobolak's immediate supervisor, yet Sobolak failed to report to Lewis that she was being sexually harassed by Simpson. Her first conversation with Lewis regarding Simpson was on November 25, 2013, when she submitted her resignation. Sobolak did not tell Lewis that she was experiencing sexual

harassment, just that she needed to leave CW&W and create distance from Simpson. [Lewis Dep. at 72].

The policy also provides employees with the option of reporting directly to any other supervisor at CW&W or to Warren, the President of the company, if their immediate supervisor was not addressing the situation in a timely manner. Despite her knowledge of CW&W's reporting procedure, Sobolak failed report Simpson's harassment to anyone. CW&W notes that throughout the entire course of events Sobolak concealed the alleged harassment from everyone at CW&W in an effort to keep her sexual interactions with Simpson a secret from her husband.

Sobolak argues that she did not unreasonably fail to take advantage of CW&W's corrective opportunities because there was not an effective channel for her to make her complaint. Sobolak notes that the only time she discussed a sexual harassment allegation regarding a different employee with Warren, she was summarily dismissed and told to "handle it" without being given the authority to do so. [Record Document 29-1 at 23]. This explanation is relevant to why Sobolak decided not to inform Warren, but it does not explain why Sobolak failed to inform Lewis, who was her direct supervisor. However, given that fact issues remain regarding the first prong of the Ellerth/Faragher affirmative defense, the Court will likewise defer its findings regarding the second prong until trial.

### III.  Punitive Damages

CW&W moves the Court to determine as a matter of law that Sobolak is not entitled to punitive damages pursuant to 42 U.S.C. § 1981a(b)(1) because CW&W did not act with malice or reckless indifference to Sobolak's federally protected rights. [Record Document 22-1 at 23].  The standard for the award of punitive damages is higher than that necessary for compensatory damages, and requires proof of malice or reckless indifference.  Hardin v. Caterpillar, Inc., 227 F.3d 268, 270 (5th Cir. 2000).  Whether malice or reckless indifference is present is ultimately a determination of the actor's state of mind. That is, the employer's knowledge that it may be acting in violation of federal law, not merely the awareness that it is engaging in discrimination. Kolstad v. American Dental Association, 527 U.S. 526, 535, 119 S.Ct. 2118, 2124 (1999).  Even if particular actors may have acted with malice and reckless indifference, an employer may avoid vicarious punitive damages if it can demonstrate a good faith effort to comply with Title VII.  Kolstad at 545-46.

CW&W argues that there is no evidence of malice or reckless indifference on its part because even if Sobolak's allegations are true, she did not utilize CW&W's reporting procedure to disclose that she was being sexually harassed. CW&W argues that when it was finally made aware of Simpson's actions in the December 10, 2013 meeting, it took action to suspend and ultimately terminate Simpson on January 2, 2014.  Thus, CW&W maintains that it acted in good faith to comply with Title VII. Sobolak maintains that Simpson acted with reckless

indifference to her protected right not to be sexually harassed. She also counters that CW&W cannot demonstrate that it made a good faith effort to comply with Title VII when it made no effort to train its employees on its harassment and discrimination policies.

Because genuine issues of material fact remain in this case, summary judgment is not appropriate on the issue of punitive damages.

## CONCLUSION

For the reasons assigned herein, Defendant's Motion for Summary Judgment [Record Document 22] is hereby **GRANTED IN PART** and **DENIED IN PART**. It is **GRANTED** as to Plaintiff's retaliation claim and her hostile work environment/sexual harassment claim based on the actions of Warren and Stewart. It is **DENIED** as to Plaintiff's hostile work environment/sexual harassment claim based on the actions of Simpson. It is **DENIED** as to the issue of punitive damages.

**THUS DONE AND SIGNED** in Shreveport, Louisiana this _22nd___ day of January, 2018.

_____
ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE